<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **GCIU-EMPLOYER RETIREMENT FUND,** et al.<br><br>   *Plaintiffs*,<br><br>   v.<br><br>**HARVARD PRESS, INC., et al.,**<br><br>   *Defendants*. | Civil Action No. 16-1074<br><br>OPINION |

**ARLEO, UNITED STATES DISTRICT JUDGE**

  **THIS MATTER** comes before the Court by way of Plaintiffs GCIU-Employer Retirement Fund's (the "Fund") and the Board of Trustees of the GCIU-Employer Retirement Fund's (the "Trustees" and, with the Fund, "Plaintiffs") Motion for Summary Judgment, ECF No. 69, and Defendant Wilrick, LLC's ("Wilrick") Motion for Summary Judgement, ECF No. 77.[1]  For the reasons that follow, Plaintiffs' Motion is **GRANTED in part** and **DENIED in part**, and Wilrick's Motion is **DENIED**.

**I. FACTUAL BACKGROUND[2]**

  This matter involves a claim for withdrawal liability pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 <u>et seq.</u>

---

[1] Defendants Harvard Press, Inc. ("Harvard Press") and Harvard Printing Co. (with Harvard Press, the "Harvard Entities" and, together with Harvard Press and Wilrick, "Defendants") neither filed an opposition to Plaintiffs' Motion nor joined Wilrick's Motion.  As such, the Court will treat Plaintiffs' Motion as unopposed by the Harvard Entities.

[2] The facts are drawn from Plaintiffs' Statement of Undisputed Material Facts ("Pl. SOMF"), ECF No. 69.3, and Wilrick's Statement of Material Facts ("Wilrick SOMF"), ECF No. 77.1.  Any factual disputes are noted by the Court.

A.      **Harvard Press & The Fund**

Harvard Press was a New Jersey corporation that operated a printing business at 550 Central Avenue, Orange, New Jersey (the "Property") from 1976 until approximately December 1, 2009.  Pl. SOMF ¶¶ 9-10.[3]  In or around 1987, C. Richard Barfuss ("Richard") and William Barfuss ("William") each assumed 50% ownership of the Harvard Entities from their father, Carl Barfuss ("Carl") and took over the Harvard Entities' management decisions upon Carl's death in 2001.  Id. ¶¶ 11-12.

At all times relevant to this action, Harvard Press was bound by a series of collective bargaining agreements (the "CBAs") with the Graphic Communications Local 612M of the Graphics Communications Conference/International Brotherhood of Teamsters (the "Union").  Id. ¶ 24.  The CBAs required that Harvard Press contribute to the Fund and the Graphic Arts Local 62B Pension Fund (the "62B Fund").  Id. ¶ 25.

The Fund is a multiemployer pension plan within the meaning of Section 3(37) of ERISA, 29 U.S.C. § 1002(37), and an employee pension benefit plan within the meaning of Section 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A).  Id. ¶ 6.  The Trustees maintain the Fund pursuant to a trust agreement.  Wenner Decl., Ex. A (the "Trust Agreement"), ECF No. 69.5.

On December 1, 2009, Harvard Press permanently ceased all operations.[4]  Pl. SOMF ¶¶ 30-31.  By letter dated February 25, 2010, the Fund notified Harvard Press that this cessation constituted a withdrawal under the CBAs and demanded $1,079,200 in withdrawal liability principal (the "Withdrawal Liability Amount"), payable in 240 installments.  Id. ¶ 32; see also Wenner Decl., Ex. F (the "Notice and Demand").  By letter dated March 29, 2010, Harvard Press

---

[3] Harvard Printing Co. was a "fictitious trade name" used by Harvard Press.  Deposition of C. Richard Barfuss dated May 4, 2017 ("Richard Dep.") at 11:5-12:2, Adler Decl., Ex. D, ECF No. 69.7.

[4] The Court refers to December 1, 2009 as the "Withdrawal Date."

appealed the Withdrawal Liability Amount. Pl. SOMF ¶ 35; see also Wenner Decl., Ex. G (the "Appeal Letter"). Harvard Press did not "identify any inaccuracies . . . furnish any additional information to the Trustees," or otherwise pursue the appeal. Pl. SOMF ¶ 37.

On August 6, 2010, the Fund sent Harvard Press a "Notice of Failure to Pay Withdrawal Liability and Demand for Cure," which provided Harvard Press with sixty days to cure its default and begin to pay its withdrawal liability. Wenner Decl., Ex. I, ECF No. 69.6 (the "Demand for Cure"). Because Harvard Press did not cure, initiate arbitration, or respond by October 5, 2010, the Withdrawal Liability Amount was "accelerated" and due in full to the Fund. Pl. SOMF ¶¶ 39-41.

### B.  Wilrick & The Property

Richard and William jointly became owners of the Property upon Carl's death. Pl. SOMF ¶¶ 18-19. On or about May 22, 2003, Richard and William entered into a member agreement to create Wilrick, a limited liability company which owns and rents real property, in which they would each hold a 50% share. Id. ¶¶ 15, 17; Wilrick SOMF ¶¶ 11W-12W; see also Tune Decl., Ex. 7 (the "Member Agreement"), ECF No. 77.5. In February 2004, Richard and William transferred ownership of the Property to Wilrick. Wilrick SOMF ¶ 13W. Harvard Press paid rent to Wilrick for use of the Property until the Property's sale in September 2008. Pl. SOMF ¶ 22.

On September 9, 2008, Wilrick sold the Property for $1,939,079.18 in immediate proceeds and a $2,450,000 purchase money mortgage. Wilrick SOMF ¶¶ 17W, 33W. William received $950,148.79 of the immediate sales proceeds; the remaining $988,930.39 was placed into an attorney trust account managed by Wilrick's attorney, Brian Fahey ("Fahey"). Id. ¶ 19W.[5]

---

[5] The parties dispute whether the payment to William was in consideration for his share of Wilrick. Compare Wilrick SOMF ¶ 20W with Pl. Response to Wilrick SOMF ¶ 20 (noting that William did not relinquish his 50% ownership of Wilrick until some time in 2010), ECF No. 78.1; see also Tune Decl., Ex. 18 (September 3, 2009 resolution that William was relinquishing his interest in Wilrick's remaining properties).

3

Pursuant to an agreement with the Property's purchaser, Harvard Press continued to operate out of the Property until its closure in December 2009. Wilrick SOMF ¶ 37W.

Wilrick owns two additional commercial properties: one is occupied by a Rite-Aid pharmacy in North Providence, Rhode Island (the "Rhode Island Property") and one is occupied by a day care center in Bedminster, New Jersey (the "Bedminster Property"). Id. ¶ 39W. Wilrick acquired the Rhode Island property in September 2009 and the Bedminster Property in February 2009. Id. ¶¶ 40W-41W. Wilrick earns income via leases on these properties. Id. ¶¶ 42W-45W.[6]

## II. PROCEDURAL HISTORY

Plaintiffs filed this action on February 25, 2016. See ECF No. 1. The Court entered default judgment against Defendants on December 22, 2016. See ECF Nos. 9-10. On July 28, 2017, the Court vacated the default due to insufficient service of process. ECF No. 17.

Plaintiffs amended the Complaint on September 12, 2017. ECF No. 26. The Amended Complaint seeks a declaration that the Harvard Entities and Wilrick were under common control, and were therefore a single employer for purposes of withdrawal liability, and an award of $1,079,200 in withdrawal liability principal, plus interest, liquidated damages, and fees pursuant to the Trust Agreement, CBAs, and ERISA. Id. at 11-12.

Plaintiffs moved for summary judgment on September 13, 2019. ECF No. 69. Wilrick initially filed both a motion for summary judgment and a cross motion for summary judgment, see ECF Nos. 70, 72. The Magistrate Judge terminated these motions for failure to comply with a previous order of the Court and Local Civil Rule 7.1, and granted Wilrick leave to file a consolidated summary judgment motion consistent with the previous order. See ECF No. 76.

---

[6] Wilrick notes that these are "triple net" leases, meaning that the tenants pay rent to Wilrick and are also responsible for paying taxes, utilities, and insurance and conducting any maintenance/repairs. Wilrick SOMF ¶¶ 44W-45W.

4

Wilrick properly moved for summary judgment on November 11, 2019, ECF No. 77, which Plaintiffs opposed, ECF No. 78.

### III. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), a motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with available affidavits, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[S]ummary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988). All facts and inferences must be construed in the light most favorable to the non-moving party. Peters v. Del. River Port Auth., 16 F.3d 1346, 1349 (3d Cir. 1994).

### IV. DISCUSSION

#### A. The Harvard Entities

Plaintiffs argue that they are entitled to summary judgment against the Harvard Entities because they have proven an ERISA claim for withdrawal liability as a matter of law. The Court agrees.

ERISA, as modified by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1381 et seq., "was designed (1) to protect the interests of participants and beneficiaries in financially distressed multiemployer plans, and (2) . . . to ensure benefit security to plan participants." IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc., 788 F.2d 118, 127 (3d Cir. 1986) (internal quotation marks and citations omitted). When an employer withdraws from an ERISA-covered plan, they incur a withdrawal liability. See 29 U.S.C. § 1381.

5

A "complete withdrawal" from an ERISA-covered plan occurs when an employer "permanently ceases all covered operations under the plan." 29 U.S.C. § 1383(a). Once a complete withdrawal occurs, the employer's withdrawal liability "'corresponds to the value of the benefits in the plan that have vested and are attributable to its employees.'" Manhattan Ford Lincoln, Inc. v. UAW Local 259 Pension Fund, 331 F. Supp. 3d 365, 381 (D.N.J. 2018) (quoting IBT Local 853 Pension Fund v. C & S Wholesale Grocers, 802 F.3d 534, 537 (3d Cir. 2015)). Following a complete withdrawal, the plan's sponsor must "determine the amount of the employer's withdrawal liability," "notify the employer of the amount of the withdrawal liability," and "collect" that amount. 29 U.S.C. § 1382. The withdrawal liability amount must be calculated pursuant to 29 U.S.C. § 1391.

Here, the Harvard Entities completely withdrew from the Fund as of December 1, 2009 because they ceased all operations. See Pl. SOMF ¶¶ 30-31. Plaintiffs satisfied ERISA's calculation and notice requirements on February 25, 2010 by sending the Notice and Demand to Richard, who was President of the Harvard Entities, because that notice contained a detailed calculation of $1,072,900 in withdrawal liability. Id. ¶¶ 30-32, 39-41. The Harvard Entities have neither contested the Withdrawal Liability Amount nor opposed Plaintiffs' Motion for Summary Judgment. The Court has independently reviewed the calculation of the Withdrawal Liability Amount and is satisfied that it comports with 29 U.S.C. § 1391. Finally, Plaintiffs have attempted to "collect" the Withdrawal Liability Amount by way of the Demand for Cure and by filing this lawsuit. See 29 U.S.C. § 1451. As such, Plaintiffs are entitled to judgment as a matter of law against the Harvard Entities for the Withdrawal Liability Amount.

Plaintiffs also seek an award of interest, liquidated damages, and attorney's fees. See Pl. Br. at 33-35, ECF No. 69.4. "[A]ny failure by the employer to make a [withdrawal liability]

payment on time shall be treated in the same manner as a delinquent contribution within the meaning of 29 U.S.C. § 1145 ["Section 1145"]." Trs. of Amalgamated Ins. Fund v. Sheldon Hall Clothing, Inc., 862 F.2d 1020, 1023 (3d Cir. 1988). When the Court enters judgment in favor of an ERISA plan sponsor pursuant to Section 1145, it shall award the plan "unpaid contributions," "interest on the unpaid contributions," "liquidated damages," and "reasonable attorney's fees and costs." 29 U.S.C. § 1132(g)(2) ("Section 1132(g)"); see also Sheldon Hall Clothing, 862 F.2d at 1023-24 (applying Section 1132(g) awards in the withdrawal liability context).

Because the Harvard Entities failed to timely pay their withdrawal liability on October 5, 2010—sixty days after the August 6, 2010 Demand for Cure—they were delinquent as of that date. Pl. SOMF ¶¶ 39-41, 88. The Fund's withdrawal liability procedures provide that interest on overdue amounts "will be assessed . . . at an annual rate equal to the average quoted prime rate on short-term commercial loans . . . as reported by the Board of Governors of the Federal Reserve System," compounded for each full quarter overdue, each full month of each partial quarter overdue, and each full day of each partial month overdue. See Wenner Decl., Ex. J, ECF No. 69.6 (the "Withdrawal Liability Procedures"). The appropriate interest rate has fluctuated between 3.25% and 5.5% for the times relevant to this lawsuit. See Pl. SOMF ¶ 87. Applying the relevant rate to the Withdrawal Liability Amount from October 5, 2010 through September 13, 2019 results in an interest amount of $359,822.22. Id. ¶ 89; Adler Decl., Ex. W, ECF No. 69.11. The Court finds that Plaintiffs are entitled to judgment in that amount from the Harvard Entities. See Sheldon Hall Clothing, 862 F.2d at 1023 ("[T]he Court shall apply the interest rate prescribed by the terms of the pension plan itself which, in this case, is ten percent . . . [and] award of these amounts . . . is mandatory for the district court[.]").

Section 1132(g) provides for liquidated damages equal to the greater of "interest on the unpaid contributions" or "liquidated damages provided for under the plan . . . not in excess of 20% . . . of the [Withdrawal Liability Amount] determined by the court." 29 U.S.C. § 1132(g)(2)(C). Here, the interest on the unpaid contributions ($359,822.22) is greater than the maximum liquidated damages (20% of the Withdrawal Liability Amount, or $215,840). Plaintiffs are thus entitled to $359,822.22 in liquidated damages from the Harvard Entities pursuant to Section 1132(g). See Sheldon Hall Clothing, 862 F.2d at 1023-24.

Finally, Plaintiffs are entitled to "reasonable attorney's fees and costs of the action" from the Harvard Entities. See 29 U.S.C. § 1132(g)(2)(D). Plaintiffs have not provided the Court with any basis to set an award of attorney's fees in their Motion for Summary Judgment. Plaintiffs may submit an application for attorney's fees and costs following entry of the Order accompanying this Opinion.

### B. Wilrick

Plaintiffs argue that they are entitled to summary judgment against Wilrick because Wilrick was part of Harvard Press's controlled group as of the Withdrawal Date. Pl. Br. at 15-27. Wilrick argues that it is entitled to summary judgment because it was not a "trade or business" for purposes of ERISA and was not part of Harvard Press's controlled group. Wilrick Br. at 23-34, ECF No. 77.2. For the following reasons, the Court concludes that there are genuine disputes of material fact as to these issues such that neither party is entitled to summary judgment.

#### 1. Trade or Business

Under ERISA, "all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer."

29 U.S.C. § 1301(b)(1).  The first issue, therefore, is determining whether Wilrick was a "trade or business" for purposes of ERISA.

In order to determine whether an entity is a "trade or business" under ERISA, "courts have relied on the tax law (IRS) definition of trade or business" provided by the Supreme Court in Commissioner v. Groetzinger, 480 U.S. 23 (1987).  See N.J. Building Laborers' Statewide Benefit Funds v. Demza Masonry LLC, No. 18-9607, 2019 WL 6493944, at *7 (D.N.J. Dec. 3, 2019). Groetzinger explained that a trade or business "must be involved in an activity with continuity and regularity and . . . the primary purpose for engaging in the activity must be for income or profit." 480 U.S. at 35.  Courts have also looked to "'whether characterizing an entity as a trade or business will fulfill the underlying purpose of the MPPAA: to prevent employers from avoiding withdrawal liability by fractionalizing their operations.'"  Demza Masonry, 2019 WL 6493944, at *7 (quoting Gov't Dev. Bank for Puerto Rico v. Holt Marine Terminal, Inc., 765 F. Supp. 2d 710, 715 (E.D. Pa. 2011)).

Wilrick asserts that as of the Withdrawal Date, it was a "passive investment," to which ERISA does not apply, not a trade or business.  Wilrick Br. at 27-29.  "In distinguishing between passive investments and conduct that constitutes a trade or business, courts focus on activities taken with respect to a particular property or holding, rather than the holding of the property itself." Holt Marine Terminal, 765 F. Supp. 2d at 718.  Indeed, "the mere possession of property, 'be it stocks, commodities, leases, or something else, without more is the hallmark of an investment.'"  Id. (quoting Cent. States, Se. and Sw. Areas Pension Fund v. Fulkerson, 238 F.3d 891, 895 (7th Cir. 2001)).  Wilrick argues that as of the Withdrawal Date, it no longer owned the Property where Harvard Press operated, and because it was merely collecting monthly rent

9

payments from its two triple net leases, it was a passive investment.  Wilrick Br. at 28-29; Wilrick SOMF ¶¶ 17W, 44W-45W.

However, "there is impressive authority for the proposition that leasing property may be a 'trade or business' under the [Internal Revenue] Code, not merely a[] [passive] investment." United Food and Commercial Workers Union v. Progressive Supermarkets, 644 F. Supp. 633, 638 (D.N.J. 1986) (collecting cases).  In Progressive Supermarkets, a company leased its premises to a supermarket that it considered a "related party" until three months before the supermarket withdrew from its ERISA pension plan.  Id. at 638-39.  The Court concluded that the leasing company was a trade or business, even though it was not leasing to the supermarket as of the withdrawal date, because to conclude otherwise would "insulate assets from ERISA liability" and "thwart [ERISA's] evident purpose," which is "[t]o prevent such fragmentation of business enterprise."  Id. at 639 (internal quotation marks and citations omitted).

Here, Wilrick leased the Property to Harvard Press from 2003 until September 2008 when it sold the Property to a third party.  Pl. SOMF ¶¶ 22, 42.  This is factually similar to the situation in Progressive Supermarkets, though the gap between the end of Wilrick and Harvard Press's leasing relationship and the Withdrawal Date is some ten months longer.  However, as part of the Property's sale, Harvard Press was allowed to continue to occupy the Property, and it did so until it ceased operations on December 1, 2009.  Pl. SOMF ¶ 43; Wilrick SOMF ¶ 37W.  Additionally, Wilrick continued to maintain an interest in the Property after the September 2008 sale because it held a purchase money mortgage that was not satisfied until 2011.  Wilrick SOMF ¶¶ 33W-36W.  And as discussed in more detail below, it is undisputed that for a significant period of its existence—from its creation in 2003 until the sale of the Property in 2008—Wilrick and Harvard Press had common ownership and control under Richard and William.  See Pl. SOMF ¶¶ 11-12,

14 (noting that Richard and William each held 50% share of Harvard Press and made all Harvard Press's management decisions for the relevant time period); 20-21 (explaining that Richard and William created Wilrick in 2003 to hold the Property and that they each had a 50% stake in Wilrick); Wilrick SOMF ¶¶ 5W (noting that Richard and William each held a 50% share of Harvard Press during the relevant period); 9W-13W (explaining that Richard and William each had a 50% interest in Wilrick at its formation in 2003 and that Wilrick was created to hold the Property). These facts suggest that allowing Wilrick to avoid withdrawal liability could "thwart" the goals of ERISA and condone "fragmentation of [the] business enterprise." Progressive Supermarkets, 644 F. Supp. at 639.

Given this record, there is a genuine dispute of material fact as to whether Wilrick constitutes a trade or business under ERISA. "A factual dispute is 'genuine' if the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Razak v. Uber Techs., Inc., 951 F.3d 137, 144 (3d Cir. 2020) (quoting Anderson 477 U.S. at 248). Said differently, "a genuine issue means that the evidence must create a fair doubt." Jersey Cent. Power & Light Co. v. Lacey Twp., 772 F.2d 1103, 1109 (3d Cir. 1985). Here, a reasonable fact-finder could conclude that Wilrick was a passive investment because it did not own the Property on the Withdrawal Date and was merely earning income from its triple net leases on the Rhode Island and Bedminster Properties. Wilrick SOMF ¶¶ 42W-45W. However, consistent with Progressive Supermarkets, a reasonable fact-finder could also conclude that Wilmark was a trade or business for the reasons described above. As such, neither Plaintiffs nor Wilrick are entitled to summary judgment. See also Demza Masonry, 2019 WL 6493944, at *7-8 (denying summary judgment on ERISA withdrawal liability claim despite evidence that defendant was a trade or business as defined by

11

Internal Revenue Code because the "totality of the facts presented" raised "some issues of fact as to whether [defendant] sought to evade withdrawal liability").

### 2. Common Control

Assuming, arguendo, that Wilrick is a trade or business under ERISA, there is an additional genuine dispute of material fact as to whether Wilrick and Harvard Press were under common control such that Wilrick was within Harvard Press's controlled group.

ERISA adopts the Internal Revenue Code's definition of "common control," see 29 U.S.C. § 1301(a)(14)(B), which identifies three different types of "controlled groups": parent-subsidiary controlled groups, brother-sister controlled groups, and combined groups, see 26 U.S.C. § 1563(a). As relevant here, a brother-sister controlled group is "two or more organizations conducting trades or businesses if (i) the same five or fewer persons . . . own . . . a controlling interest in each organization and (ii) . . . such persons are in effective control of each organization." 26 C.F.R. § 1.414(c)-2(c)(1). A "controlling interest" in a corporation means "possessing at least 80 percent of total combined voting power of all classes of stock entitled to vote . . . or at least 80 percent of the total value of shares of all classes of stock," 26 C.F.R. § 1.414(c)-2(b)(2), and "effective control" of a corporation means "own[ing] stock possessing more than 50 percent of the total combined voting power of all classes of stock entitled to vote or more than 50 percent of the total value of shares of all classes of stock," 26 C.F.R. § 1.414(c)-2(c)(2).[7] These controlled group regulations have been applied to limited liability corporations ("LLCs"). See, e.g., Steelworkers

---

[7] Courts consider ownership as of the withdrawal date when conducting a controlled group analysis. See Bd. of Trs. of Trucking Emps. of North Jersey Welfare Fund, Inc. v. Kero Leasing Corp., 377 F.3d 288, 300 (3d Cir. 2004) (noting "there has been no finding here by any court or arbitrator that [one defendant] was an employer or a member of the controlled group within the meaning of the MPPAA at the time [another defendant] withdrew from the Fund" and concluding "that such a finding would be a necessary predicate" to applying a precedent regarding ERISA's notice requirements) (emphasis added); Bd. of Trs. of Trucking Emps. of N. Jersey Welfare Fund, Inc. Pension Fund v. Centra, 983 F.2d 495, 501 (3d Cir. 1992) (analyzing controlled group membership at "the date the contributing company withdraws from a multiemployer pension fund").

Pension Tr. by Bosh v. Renco Grp., Inc., 694 F. App'x 69, 71-73 (3d Cir. 2017); Bd. of Trs. of the Trucking Emps. of N. Jersey Welfare Fund, Inc. v. 160 E. 22nd St. Realty, LLC, No. 15-889, 2016 WL 4582046, at *15-19 (D.N.J. Sept. 2, 2016).

As of the Withdrawal Date, Richard and William each owned a 50% share of Harvard Press. Pl. SOMF ¶ 14; Wilrick Counterstatement of Facts ¶ 14, ECF No. 79.1. There is a genuine dispute as to whether William still held a 50% interest in Wilrick as of the Withdrawal Date, such that Wilrick would be under "common control" of Harvard Press because the same "five or fewer persons" (i.e., Richard and William) had a controlling interest and effective control in both entities, or whether William withdrew from Wilrick when it sold the Property in September 2008.

Plaintiffs argue that William retained his 50% interest in Wilrick beyond the Withdrawal Date. Pl. Br. at 22-27. As support, they offer several pieces of evidence. First, Plaintiffs note that William testified in his first deposition that he transferred his ownership interest in Wilrick to Richard in 2010. See Deposition of William Barfuss dated May 4, 2017 ("William Dep.") at 8:14-19 ("I'm thinking right after 2010. We closed the [Harvard Press] business in December 2009 so I would think around 2010."), Adler Decl., Ex. E, ECF No. 69.7. Second, when asked at his first deposition, "who are the shareholders of Wilrick?" Richard replied, "My brother and I." Richard Dep. at 13:23-25. Third, Wilrick's counsel represented in its response to Plaintiffs' First Request for Admissions that Richard and William each owned 50% of Wilrick as of the Withdrawal Date. Pl. SOMF ¶ 55; Adler Decl., Ex. T ¶ 3 ("It is admitted that the Wilrick, LLC was owned 50/50 by Richard Barfuss and William Barfuss on December 1, 2009 and for a time thereafter."), ECF No. 69.11.[8]

---

[8] Wilrick notes that this answer was amended on December 21, 2018 to state that Richard "owned 100% of Wilrick, LLC as of September 9, 2008." Wilrick SOMF ¶ 53W. Plaintiffs objected to this amendment. Following a conference on February 7, 2019, the Magistrate Judge allowed the amendment but noted that the fact "that the erroneous statement had been made and then corrected would remain part of the record." Id. ¶¶ 54W-58W

13

Wilrick argues that William had no interest in Wilrick as of the Withdrawal Date because the $950,148.79 check William received from the Property's sale was "consideration for his 50% share of Wilrick, which he completely relinquished to [Richard] in September 2008." Wilrick SOMF ¶¶ 19W-20W; see also Wilrick Br. at 33-34. For further evidential support, Wilrick points to William and Richard's August 27, 2018 depositions, wherein they testified that they made an oral modification to the Wilrick Member Agreement in September 2008 which provided that Richard would be the sole owner of Wilrick following the sale of the Property. See Deposition of C. Richard Barfuss dated Aug. 27, 2018 ("Richard Dep. II") at 38:21-41:5, Tune Decl., Ex. 3, ECF No. 77.5; Deposition of William Barfuss dated Aug. 27, 2018 ("William Dep. II") at 12:5-11, 18:20-19:15, Tune Decl. Ex. 6, ECF No. 77.5.

Additionally, on September 3, 2009, William and Richard executed a formal resolution that William was "no longer a Manager or Member of [Wilrick] with respect to" the Rhode Island Property and the Bedminster Property. Tune Decl., Ex. 18, ECF No. 77.6 (the "September 2009 Wilrick Resolution"). Wilrick argues that this is further proof that William was "completely separate from Wilrick" as of the Withdrawal Date because the Rhode Island and Bedminster Properties were Wilrick's only holdings in December 2009. See Wilrick Reply Br. at 11-12, ECF No. 79.[9]

This conflicting evidence creates a genuine dispute of material fact as to Wilrick's ownership as of the Withdrawal Date. Indeed, William himself has offered inconsistent testimony on this core issue. Compare William Dep. at 8:14-19 (testifying that he relinquished his interest in Wilrick to his brother, and when asked when this occurred, responding, "I'm thinking right after

---

[9] The September 2009 Wilrick Resolution, however, speaks only to the Rhode Island and Bedminster Properties. It does not address the Wilrick Member Agreement generally, nor does it mention the Property, in which Wilrick still held a purchase money mortgage. See Wilrick SOMF ¶¶ 33W-36W.

14

2010. We closed the [Harvard Press] business in December 2009 so I would think around 2010") with William Dep. II at 12:5-11 ("In September 2008 I was out of Wilrick"); see also Burton v. Teleflex Inc., 707 F.3d 417, 428-29 (3d Cir. 2013) (vacating grant of summary judgment where district court "credit[ed]" certain testimony and "disregard[ed] . . . conflicting testimony"); Pichler v. UNITE, 542 F.3d 380, 386 (3d Cir. 2008) (noting that on a motion for summary judgment, "[t]he court may not . . . weigh the evidence or make credibility determinations as these tasks are left for the fact-finder") (internal quotation marks and citation omitted). Because Wilrick's ownership as of the Withdrawal Date is in dispute, the Court cannot determine as a matter of law whether Wilrick was a member of Harvard Press's controlled group pursuant to 29 U.S.C. § 1301. As such, neither Plaintiffs nor Wilrick are entitled to summary judgment.[10]

## V. CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Summary Judgment, ECF No. 69, is **GRANTED** as to the Harvard Entities and **DENIED** as to Wilrick, and Wilrick's Motion for Summary Judgment, ECF No. 77, is **DENIED**. An appropriate Order follows.

Dated: 04/28/2020

/s Madeline Cox Arleo
**HON. MADELINE COX ARLEO**
**UNITED STATES DISTRICT JUDGE**

---

[10] Wilrick's arguments regarding notice and the statute of limitations, see Wilrick Br. at 11-21, 34-36, turn on whether it was part of Harvard Press's controlled group. See Kero Leasing, 377 F.3d at 296-300; Barker & Williamson, 788 F.2d at 122-24, 126-30. Because the Court finds that there is a genuine dispute of material fact as to the controlled group issue, it does not address these arguments at this time.

Wilrick also argues that Plaintiffs' claims are precluded because of previous litigation with the 62B Fund. See Wilrick Br. at 36-40. The Court disagrees. Plaintiffs were not parties to 62B Fund litigation, and Wilrick has not offered evidence that Plaintiffs could be considered in privity with the 62B Fund for res judicata purposes. See Pl. SOMF ¶¶ 64-76. As such, Plaintiffs' claims are not precluded. See Collins v. E.I. DuPont de Nemours & Co., 34 F.3d 172, 176-79 (3d Cir. 1994).