**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| GCIU-EMPLOYER RETIREMENT FUND; BOARD OF TRUSTEES OF THE GCIU-EMPLOYER RETIREMENT FUND, | : : : : : |
|  | : |
| **Plaintiffs,** | : |
|  | : |
| v. | : |
|  | : |
| HARVARD PRESS, INC.; HARVARD PRINTING CO.; WILRICK, LLC, | : : : |
|  | : |
| **Defendant.** | : |
|  | : |

Civil Action No. 16-1074 (MAH)

OPINION

**HAMMER, United States Magistrate Judge**

## I.    INTRODUCTION

This matter comes before the Court on the claim of Plaintiffs, GCIU-Employer Retirement Fund and Board of Trustees of the GCIU-Employer Retirement Fund, for withdrawal liability pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, as amended by the Multi-Employer Pension Plan Amendment Act of 1980 ("MPPA"), 29 U.S.C.  §§ 1381-1461.  The Court conducted a bench trial on November 6, 2024. *See* Trial Tr., D.E. 175.  The parties have submitted post-trial briefs with proposed findings of facts and conclusions of law, as well as responses to each other's proposed findings of fact and conclusions of law.  D.E. 181, 182, 185, 186.  The Court now issues its findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).

Having considered the evidence introduced at trial, evaluated the witnesses' credibility, and reviewed the parties' submissions and the applicable law, the Court finds that Plaintiffs have failed to carry their burden of proof and enters judgment in favor of Defendant.

## II.    BACKGROUND AND PROCEDURAL HISTORY

On February 25, 2016, Plaintiffs GCIU-Employer Retirement Fund (the "Fund") and Board of Trustees of the GCIU-Employer Retirement Fund ("Board of Trustees") (together, "Plaintiffs" or "GCIU") filed a Complaint against Defendants Harvard Press, Inc. ("Harvard Press"), Harvard Printing Co. ("Harvard Printing") (together, the "Harvard Entities"), and Wilrick, LLC ("Wilrick") (together with the Harvard Entities, "Defendants") for withdrawal liability pursuant to ERISA, 29 U.S.C. § 1001 *et seq.*, as amended by the MPPA, 29 U.S.C. §§ 1381-1461.  Compl., D.E. 1.

On December 22, 2016, the Honorable Madeline Cox Arleo entered default judgment against Defendants.  Op. & Order, D.E. 9-10.  However, on July 28, 2017, the Court vacated its Opinion and Order, finding insufficient service of process.  Order, D.E. 17.

On September 12, 2017, Plaintiffs amended the Complaint.  D.E. 26.  Plaintiffs seek to recover $1,079,200 in withdrawal liability principal, as well as interest, liquidated damages, and attorneys' fees from Defendants.  Plaintiffs allege that when Harvard Press ceased operation on December 1, 2009, that cessation triggered the Harvard Entities' obligations for withdrawal liability in accordance with their collective bargaining agreements with the Graphic Communications Local 612M of the Graphics Communications Conference/International Brotherhood of Teamsters, and the withdrawal provisions of ERISA.  Plaintiffs also assert that for purposes of withdrawal liability, the Harvard Entities and Wilrick constituted a single employer because those entities were under common control.

After completing discovery, on September 13, 2019, Plaintiffs moved for summary judgment.  D.E. 69.  Wilrick filed both a motion for summary judgment and a cross motion for summary judgment.  D.E. 70, 72.  The Undersigned terminated Wilrick's motions for failure to comply with Local Civil Rule 7.1 and a previous Order of the Court, D.E. 66.  D.E. 76.  On November 11, 2019, Wilrick filed one, fulsome summary judgment motion.  D.E. 77.  Judge Arleo granted in part and denied in part Plaintiffs' motion, and denied Wilrick's motion.[1]  D.E. 80.  Judge Arleo granted Plaintiffs' summary judgment motion as to the Harvard Entities[2] but denied it as to Wilrick.  *Id.*

Regarding Wilrick's withdrawal liability as part of Harvard Press's controlled group on the Withdrawal Date, the District Court denied the parties' cross-motions for summary judgment. SJ Op., D.E. 80, at 8-15.  The District Court identified genuine issues of material fact concerning two prongs of the analysis.  First, the Court determined that there were genuine issues of material fact regarding whether Wilrick constituted a "trade or business" under 29 U.S.C. § 1301.  *Id.* at 11.  Second, the Court concluded that there were genuine issues of material fact concerning whether Harvard Press and Wilrick "were under common control such that Wilrick was within Harvard Press's controlled group" as of the Withdrawal Date.  *Id.* at 12.  There is little dispute

---

[1]  Defendants Harvard Press, Inc. and Harvard Printing Co. (the "Harvard Entities") did not join in Wilrick's motion and did not oppose Plaintiffs' motion.  D.E. 80.  Accordingly, Judge Arleo deemed Plaintiffs' motion directed to the Harvard Entities as unopposed.  *Id.*

[2]  Judge Arleo concluded that the Harvard Entities completely withdrew from the Fund on December 1, 2009, when Harvard Press permanently ceased all operations.  Op., D.E. 80, at 6. Her Honor also concluded that Plaintiffs had satisfied the notice-and-calculation requirements of ERISA, and that the Harvard Entities had not contested the amount of withdrawal liability.  *Id.* Therefore, the Court granted summary judgment in Plaintiffs' favor as to the Harvard Entities in the amount of $1,079,200 in withdrawal liability principal, $359,822.22 in interest, and $359,822.22 in liquidated damages.  Order, D.E. 81.

that on December 1, 2009, Richard and William each held a 50% share of Harvard Press. *Id.* at 13. But fact disputes precluded the District Court from determining whether William still held a 50% interest in Wilrick as of the Withdrawal Date. *Id.* The Court pointed out several potentially conflicting pieces of evidence, including that William had offered inconsistent deposition testimony concerning whether and when he had relinquished his interest in Wilrick to Richard. *Id.* at 14-15. Therefore, the District Court "[could not] determine as a matter of law whether Wilrick was a member of Harvard Press's controlled group pursuant to 29 U.S.C. § 1301." *Id.* at 15.

On December 27, 2021, the parties consented to the jurisdiction of the Undersigned. D.E. 126. On September 19, 2022, Wilrick filed a motion seeking to preclude certain testimony of William Barfuss ("William").[3] D.E. 140. Plaintiffs opposed the motion. D.E. 141. The Undersigned denied Wilrick's motion. D.E. 148-149.

On November 6, 2024, the Undersigned conducted a one-day bench trial, during which the parties were provided the opportunity to be heard, examine and cross-examine witnesses, and present evidence weighing on the issues. The parties each submitted proposed findings of fact and conclusions of law on February 21, 2025. D.E. 181, 182. On May 1, 2025, the parties each submitted responsive proposed findings of fact and conclusions of law. D.E. 185, 186. The contested issues before the Court are: (1) whether Wilrick was under common control with the Harvard Entities as of the December 1, 2009 withdrawal date; and (2) and whether Wilrick was a trade or business.

---

[3] Because C. Richard Barfuss and William Barfuss share a surname, the Undersigned refers to them by their first names. The Undersigned does so solely for the sake of clarity and intends no disrespect to any party.

## III.   FINDINGS OF FACT

The Court derives its findings of fact from the exhibits and deposition transcripts admitted at trial or separately stipulated by the parties, and the trial testimony of Brian W. Fahey ("Mr. Fahey")[4] and C. Richard Barfuss ("Richard").[5]   The Court has also considered the parties' proposed findings of fact and responsive proposed findings of fact.   *See* D.E. 181, 182, 185, 186. Finally, the Court relies on the facts as established in Judge Arleo's Opinion of the parties' summary judgment motions, since they are the law of the case in this matter.

---

[4]   During all times relevant to this action, Mr. Fahey was a general legal practitioner. Trial Tr., D.E. 175, 117:12-16.   At trial, Mr. Fahey testified that he met Richard sometime between 2006 and 2008, when one of Richard's sisters hired him in connection with the sale of their parents' home.   *Id.* at 118:9-11, 118:20-24.   Mr. Fahey represented Richard in the purchase and sale of various commercial properties via his limited liability companies.   *Id.* at 121:1-3.   He also represented William in various matters from mid-2000 through late 2021.   *Id.* at 119:9-120:17. Mr. Fahey first represented Harvard Press in or around March 29, 2010, when he sent a response to a letter from the Administrator of the GCIU Employer Retirement Fund concerning withdrawal liability.   *Id.* at 122:19-127:11; *see also* P 11, Ex. A, Mr. Fahey's March 29, 2010 letter to Mr. Wenner.   Mr. Fahey began representing Wilrick in connection with the sale of the Property.   Trial Tr., D.E. 175, 128:8-20.   He also represented Harvard Press, Wilrick, and Richard in a 2012 lawsuit brought against them by the 62B Fund.   *Id.* at 50:25-53:19.   In this case, Mr. Fahey continues to represent the Harvard Entities and Wilrick.   Order, D.E. 17; *see* docket generally.

[5]   The Court finds that both Richard and Mr. Fahey were credible witnesses.   In making a credibility determination regarding the testimony of witnesses, the Court must consider: demeanor and tone of voice, *see Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985); basis of knowledge, outside influence, bias, and extent to which testimony is self-servicing, *see Dardovitch v. Haltzman*, 190 F.3d 125, 140-41 (3d Cir. 1999); evidentiary support for testimony, *see United States v. Kole*, 164 F.3d 164, 177 (3d Cir. 1998); and whether the testimony is coherent, plausible, and internally consistent, *see Newark Branch, N.A.A.C.P. v. City of Bayonne*, 134 F.3d 113, 120 (3d Cir. 1998).   The testimony of Richard and Mr. Fahey was corroborated by other evidence in the record.   Moreover, the testimony of each witness was consistent with the testimony of the other witness.   Finally, as an officer of the Court, Mr. Fahey owes a duty of candor to the tribunal.   *See* N.J. Rules Prof'l Conduct R. 3.3.

## A. The Parties

Plaintiffs serve as the Trustees and fiduciaries of the Fund within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Op., D.E. 80, at 2. The Fund qualifies as a multiemployer pension plan under ERISA § 3(37), 29 U.S.C. § 1002(37), and as an employee pension benefit plan under ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A). *Id.* The Fund is maintained in accordance with the terms of its Trust Agreement. *Id.*

Harvard Press, a New Jersey corporation, operated a commercial printing business from approximately 1976 until December 1, 2009. *See id.*; Trial Tr., D.E. 175, 14:1-2; JT 3, Richard's May 4, 2017 Dep. Tr., 6:20-23; JT 5, Richard's Aug. 18, 2018 Dep. Tr., 7:21-24; JT 6, William's Aug. 18, 2018 Dep. Tr., 6:9-18. Harvard Press also conducted business under the name Harvard Printing, a fictitious trade name. Op., D.E. 80, at 2 n.3.

From 2001 until it ceased operations, Harvard Press maintained its printing facility at 550 Central Avenue, Orange, New Jersey 07050 (the "Property"). Trial Tr., D.E. 175, 15:2-19; JT 3, Richard's May 4, 2017 Dep. Tr., 11:25-12:9, 12:21-24; JT 5, Richard's Aug. 18, 2018 Dep. Tr., 11:15-12:4; JT 6, William's Aug. 18, 2018 Dep. Tr., 9:2-8.

From as early as 1987 until the date of withdrawal, brothers Richard and William each owned a 50% interest in the Harvard Entities. Op., D.E. 80, at 2; Trial Tr., D.E. 175, 12:24-13:25; JT 3, Richard's May 4, 2017 Dep. Tr., 5:11-6:18, 32:21-35:16; JT 4, William's May 4, 2017 Dep. Tr., 5:13-23; JT 6, William's Aug. 18, 2018 Dep. Tr., 6:9-18. Beginning in 2001, Richard and William were responsible for all management decisions at the Harvard Entities. Op., D.E. 80, at 2; JT 3, Richard's May 4, 2017 Dep. Tr., 32:21-35:16; JT 4, William's May 4, 2017 Dep. Tr., 5:13–23; JT 5, Richard's Aug. 18, 2018 Dep. Tr., 9:17-10:10. Richard and William handled all tasks necessary to operate the business. Trial Tr., D.E. 175, 14:9-12. From

6

2001 through 2009, they alone held responsibility for Harvard Press's operations, which they shared. *Id.*, 14:17-15:1.

Until his death in 2001, Carl Barfuss, the father of Richard and William, owned the Property. *Id.*, 16:23-17:1; JT 3, Richard's May 4, 2017 Dep. Tr., 14:15-25. Upon Carl's death, the Property passed to Richard and William. Trial Tr., D.E. 175, 16:13-22. After the Property passed to Richard and Carl, each brother held a 50% ownership interest in it. Op., D.E. 80, at 3; Trial Tr., D.E. 175, 17:2-7, 19:17-20, 62:15-22; JT 8, 2003 Member Agreement.

On May 22, 2003, Richard and William entered into a Member Agreement forming Wilrick, a limited liability company, "which owns and rents real property, in which they would each hold a 50% share." Op., D.E. 80, at 3; JT 8, 2003 Member Agreement. Wilrick's Member Agreement provides that Richard and William are Wilrick's sole members and managers, vested exclusively with "[a]ll powers to manage [Wilrick's] affairs, in any and every respect." Op., D.E. 80, at 3; JT 8, 2003 Member Agreement. The Member Agreement "may be amended, altered or modified at any time" and there is no requirement therein that such modification be in writing. JT 8, 2003 Member Agreement. At its formation, Richard and William each held a 50% ownership interest in Wilrick. Op., D.E. 80, at 3; JT 8, 2003 Member Agreement. Both Richard and William executed the 2003 Member Agreement. Trial Tr., D.E. 175, 20:9-16; JT 8, 2003 Member Agreement.

Wilrick was established as a holding company for the purpose of holding title to the Property, and to own and lease real property. Trial Tr., D.E. 175, 17:19-24, 18:15-17; JT 3, Richard's May 4, 2017 Dep. Tr., 11:30-12:2, 15:2-5; JT 6, William's Aug. 27, 2018 Dep. Tr., 8:20-25; JT 8, 2003 Member Agreement. The brothers formed Wilrick because they did not want to "have personal liability on the [P]roperty because it was [not] the up-to-date, beautiful

7

property.  So it was to limit our liability."  Trial Tr., D.E. 175, 16:16-19.  In February 2004, Richard and William transferred the Property to Wilrick.  *Id.* at 16:13-22, 62:15-22; JT 3, Richard's May 4, 2017 Dep. Tr., 11:20-12:2, 21:3-5, 14:10-14; JT 8, 2003 Member Agreement.

From the formation of Wilrick until the property was sold in September 2008, Harvard Press operated out of the Property and was a tenant there.  Op., D.E. 80, at 3; Trial Tr., D.E. 175, 17:19-23, 96:14-18; JT 3, Richard's May 4, 2017 Dep. Tr., 48:3-14.  Between 2001 and 2008, Richard and William were responsible for maintaining the Property.  Trial Tr., D.E. 175, 19:5-8.  During that period, the brothers either performed necessary repairs themselves or arranged for others to complete repairs.  Trial Tr., D.E. 175, 90:5-12.

Bob Wyckoff served as Harvard Press's bookkeeper.  Trial Tr., D.E. 175, 74:12–16; JT 5, Richard's Aug. 18, 2018 Dep. Tr., 14:15-20.  He was not employed by Wilrick and received no compensation from Wilrick.  Trial Tr., D.E. 175, 74:19-75:1.  However, acting on Wilrick's behalf, Bob Wyckoff collected rent for the Property.  *Id.* at 19:8-13.  In addition, unrelated businesses paid Wilrick to store vehicles at the Property.  *Id.* at 97:2-12.

**B. The Collective Bargaining Agreements**

Harvard Press was party to a series of collective bargaining agreements and related documents (the "CBAs") with Graphic Communications Local 612M of the Graphics Communications Conference/International Brotherhood of Teamsters (the "Union").  Op., D.E. 80, at 2; JT 3, Richard's May 4, 2017 Dep. Tr., 7:21-8:17.  Under the CBAs, Harvard Press was required to make contributions to: (1) the Fund, located in California, and (2) the Graphic Arts Local 62B Pension Fund (the "62B Fund"), located in New Jersey.  Op., D.E. 80, at 2.

## C. Withdrawal Liability

On or about December 1, 2009, Harvard Press permanently ceased all covered operations under the Fund and/or permanently ceased its obligation to contribute to the Fund, thereby effecting a complete withdrawal. Op., D.E. 80, at 2; JT 3, Richard's May 4, 2017 Dep. Tr., 7:3-6. On the date of withdrawal, William and Richard each held a 50% interest in Harvard Press. By letter dated February 25, 2010 (the "Notice and Demand"), the Fund notified Harvard Press that due to its withdrawal, it was liable for $1,079,200 in withdrawal liability principal, payable in 240 installments. Op., D.E. 80, at 2. William provided the Notice and Demand to Mr. Fahey. Trial Tr., D.E. 175, 123:20-124:18. After reviewing the Notice and Demand, Mr. Fahey spoke with then-Fund Administrator Matthew Wenner. *Id.* at 125:18-25, 126:17-18. On March 29, 2010, Harvard Press, through Mr. Fahey, submitted an appeal of the withdrawal liability assessment based on its cessation of operations. *Id.* at 126:6-18; P 11, Ex. A (attached to Mr. Wenner's declaration), Mr. Fahey's March 29, 2010 letter to Mr. Wenner. Richard, William, and Barbara Wyckoff[6] were copied on that correspondence.[7] P 11, Ex. A, Mr. Fahey's March 29, 2010 letter to Mr. Wenner. However, Harvard Press did not identify any errors in the

---

[6] Barbara was the wife of Bob Wyckoff, Harvard Press's bookkeeper. Trial Tr., D.E. 175, 74:7-8.

[7] Plaintiffs provided no evidence at trial that written notice was served on Wilrick. *See*, *generally*, Trial Tr., D.E. 175. The single piece of evidence on the subject of notice is Mr. Fahey's March 29, 2010 letter to the Fund. P 11, Exhibit A, Mr. Fahey's March 29, 2010 letter to Mr. Wenner. But this letter establishes only that Richard retained Mr. Fahey to respond to the Notice and Demand to Harvard Press. Indeed, at trial, Mr. Fahey testified that he represented Harvard Press when he responded to the Notice and Demand. Trial Tr., D.E. 175, 123:11-18, 127:8-11. It does not establish that Wilrick received any direct notice of the withdrawal liability. Moreover, Mr. Fahey testified that he represented Wilrick only as regarded its real estate transactions. *Id.* at 128:6-132:6.

9

calculation of the assessment, did not provide additional information to the Trustees, and did not further pursue the appeal.  Op., D.E. 80, at 2.

On August 6, 2010, the Fund issued a Notice of Failure to Pay Withdrawal Liability and Demand for Cure.  The notice and demand advised Harvard Press that it had failed to make the required payments and that failure to cure within 60 days would result in default under the applicable statute.  *Id.*  Harvard Press did not cure the default and made no withdrawal liability payments.  *Id.* at 2-3.  At the time of default, Harvard Press neither disputed the accuracy of the assessment nor initiated arbitration.  *Id.* at 3.  As a result, the withdrawal liability was accelerated, and the full principal amount became immediately due.  *Id.*

**D. Sale of the Property**

In September 2008, Wilrick entered a contract to sell the Property.  Trial Tr., D.E. 175, 21:23-22:11; P2, Property Closing Statement.  The agreed sale price was $4,556,585.18.  Trial Tr., D.E. 175, 21:23-22:11; P2, Property Closing Statement.  Mr. Fahey served as Wilrick's counsel in connection with the sale.  Trial Tr., D.E. 175, 33:3-6.  Sometime after Wilrick entered the contract for sale in September 2008, Richard and William, acting as Wilrick's Managing Members, executed an undated resolution ("the Resolution") authorizing the sale.  JT 9, Resolution.  Richard and William authorized Richard to execute documents relating to the sale of the Property.  JT 9, Resolution.  Mr. Fahey testified that the Resolution was drafted after execution of the contract for sale but before closing, i.e., prior to September 9, 2008.  Trial Tr., D.E. 175, 133:16-134:7.  The Resolution identified Richard and William as Managing Members of Wilrick, and both signed the document.  *Id.* at 35:15-22; JT 9, Resolution.

By agreement with the purchaser, Harvard Press remained at the Property after the sale through December 2009.  Op., D.E. 80, at 4; Trial Tr., D.E. 175, 25:11-26:6, 136:21-137:16.

10

According to Richard, Harvard Press was not conducting business after the sale of the Property in September 2008, but the new owners of the Property asked Harvard Press to remain at the Property to keep out looters.  Trial Tr., D.E. 175, 26:2-21, 136:21-137:12.  Following the closure of Harvard Press, some of its equipment briefly remained stored at the Property.  *Id.* at 15:20-16:5.

Because the buyer agreed to pay the approximately $4.45 million purchase price in installments, Wilrick retained a $2.45 million purchase money mortgage on the Property, plus interest.  Op., D.E. 80, at 3; Trial Tr., D.E. 175, 22:12-25:10; P 4, Mortgage.  Mr. Fahey drafted the Mortgage.  Trial Tr., D.E. 175, 135:14-136:1.  Wilrick received $1,939,079.18 in immediate proceeds from the sale.  Op., D.E. 80, at 3.  Richard and William divided the approximately $1.9 million paid by the purchaser at closing.  Trial Tr., D.E. 175, 27:10-16, 87:7-11; JT 10, Client Trust Records.  On September 10, 2008, William received a check for roughly 49% of the $1.9 million or $950,148.79.  Op., D.E. 80, at 3; Trial Tr., D.E. 175, 29:12-30:3, 138:16-17; JT 10, Client Trust Records.  Richard's share of the proceeds, roughly 51% or $988,930.39, was deposited into Mr. Fahey's attorney trust account for Wilrick.  Op., D.E. 80, at 3; JT 10, Client Trust Records.  Richard's share was then distributed through a Section 1031 (*i.e.*, Section 1031 of the Internal Revenue Code) like-kind exchange, "for the purpose of transferring ownership of one property to another without paying income tax."  Trial Tr., D.E. 175, 30:4-15, 65:7-11, 138:16-24; JT 10, Client Trust Records.  The replacement properties acquired by Wilrick through the Section 1031 like-kind exchange are in Bedminster, New Jersey (the "Bedminster Property") and Providence, Rhode Island (the "Rhode Island Property").  Op., D.E. 80, at 4; Trial Tr., D.E. 175, 30:20-24.  Wilrick purchased the Bedminster Property in February 2009 and the

11

Rhode Island Property in September 2009.  Op., D.E. 80, at 4.  Wilrick derives income from leases on these properties.  *Id.*

The purchaser of the Property made mortgage offset payments on February 25, 2010, and August 4, 2010, through Mr. Fahey, who maintained the relevant records.  JT 10, Client Trust Records.  Those records reflect that in addition to the immediate payment William received on September 10, 2008, he also received the following payments as his share of Wilrick's profits from the Property sale: (a) $26,250 on December 14, 2010; and (b) $847,500 on March 2, 2011.  JT 10, Client Trust Records.  Richard received $101,000 on August 4, 2010.  Trial Tr., D.E. 175, 30:25-31:9.  He also received $26,250 in December 2010 and $847,500 in March 2011.  *Id.* at 139:20-24, 140:7-12; JT 10, Client Trust Records.  These payments were made in consideration for the sale of the Property.  Trial Tr., D.E. 175, 140:7-12.  On January 25, 2011, Wilrick deemed the mortgage satisfied pursuant to an Accord and Satisfaction.  *Id.* at 33:13-34:8; JT 11, Accord and Satisfaction.

### E. Wilrick Ownership Structure

William withdrew from Wilrick at the time of the sale of the Property on September 9, 2008.[8]  Trial Tr., D.E. 175, 38:9-20, 44:9-13, 44:18-25, 64:22-65:3, 67:18-20, 70:10-25, 145:7-146:10, 149:2-9, 158:23-159:3; JT 3, Richard's May 4, 2017 Dep. Tr. 48:22-49:19; JT 5,

---

[8]  At his May 4, 2017 deposition, William testified that he transferred his ownership interest in Wilrick to his brother in or around 2010.  *See* JT 4, William's May 4, 2017 Dep. Tr., 8:17-19.  In response to a question asking when he transferred his interest in Wilrick to his brother, William responded:  "You know, I'm thinking right after 2010.  We closed the business in December 2009 so I would think around 2010."  However, the Court affords it very little weight because it is inconsistent with Richard's testimony both during his depositions and at trial.  Moreover, it is inconsistent with William's own testimony during the May 4, 2017 deposition and his subsequent deposition taken on August 27, 2018.  For example, William stated that he transferred ownership in Wilrick to Richard because they sold the Property.  *See* JT 4, William's May 4, 2017 Dep. Tr., 9:8-9; *see also* JT 6, William's Aug. 27, 2018 Dep. Tr., 12:7.  As explained above, however, the Property was sold on September 9, 2008.

Richard's Aug. 27, 2018 Dep. Tr. 12:5-13:23; JT 6, William's Aug. 27, 2018 Dep. Tr. 12:7; D3, Amended Response to RFA #3.  This withdrawal was effectuated through an oral agreement, which was subsequently memorialized, in part, in writing.  Trial Tr., D.E. 175, 38:9-20; P 5, September 3, 2009, Agreement.

Richard testified that he and William each executed a "quitclaim" document that memorialized their oral agreement to divest William of his ownership interest in Wilrick.  Trial Tr., D.E. 175, 70:3-71:14, 145:11-23.  Apparently, the purpose of that agreement was to shield Richard from any potential claims that William's wife could have asserted during their divorce proceedings.  *Id.*  Richard testified that he was concerned William's wife might seek to pursue him for Wilrick-owned properties as part of William's divorce proceedings.  *Id.* at 70:3-8. According to Richard, William therefore agreed to sign the Agreement.  *Id.* at 70:3-11.[9]  Wilrick did not produce the document because Richard could not locate it.  *Id.* at 70:19-23.  Richard

---

[9]  Plaintiffs contend in their proposed findings of fact that on February 9, 2004, the Superior Court of New Jersey, Chancery Division, Family Part, Morris County (FM-1393-01), entered a Supplemental Dual Judgment of Divorce ("Judgment of Divorce") that dissolved the marriage of William and Mary Ellen Barfuss.  The parties divided their personal assets in that proceeding in 2004.  Findings of Fact, D.E. 181, ¶ 107.  The Judgment of Divorce expressly provided that "the Court did not allow equitable distribution in regard to the asset known as Harvard Press Inc. or to the underlying real estate upon which it operates."  *Id.* at ¶ 108 & Ex. A, at 7, ¶ 13.

Counsel for Wilrick filed a responsive letter that objected to what Wilrick characterized as an improper attempt to introduce evidence of William's divorce after the close of evidence at trial, and urged the Court to preclude the Judgment of Divorce from consideration.  D.E. 183. Plaintiffs responded that judicial notice can be taken at any time, including post-trial and that the Court's consideration of the Judgment of Divorce in no way undermines that Court's factfinding authority.  D.E. 184.

That the Judgment of Divorce was entered five years before the 2009 Agreement is not material to the Court's analysis.  A clumsy attempt to protect assets or not does not move the needle.  The Court need not determine when or whether William divorced his wife.  As the Court concludes herein, there is ample evidence that William was no longer a member of Wilrick after the sale of the Property.

testified that he obtained the quitclaim deed from the Internet and acknowledged that he did not know what a quitclaim deed was. *Id.* at 78:13-16.

Mr. Fahey testified that Richard showed him the quitclaim deed shortly after the September 9, 2008, closing. *Id.* at 146:6-10. Mr. Fahey corroborated Richard's testimony that Richard had sought written protection in the form of the quitclaim deed because William was undergoing a divorce at the time. *Id.* at 147:9-12. Mr. Fahey informed Richard that the quitclaim deed had the wrong title because that was not what the document was, but the document itself would be fine for William to sign. *Id.*, 146:11-16.

Richard and William agreed to split the proceeds from the sale of the Property equally. *Id.*, 159:19-22, 159:24-25; JT 10, Client Trust Records. Following the sale of the Property, Richard and William went their separate ways as a business matter. Trial Tr., D.E. 175, 38:9-16, 69:15-70:2. Upon payoff of the mortgage, the funds were remitted to the trust account of Mr. Fahey, with Richard's portion directed to Wilrick, and William's portion distributed directly to William. *Id.* at 133:10-141:15; JT 10, Client Trust Records.

After the sale of the Property, Richard utilized Wilrick in order to acquire replacement real estate through a Section 1031 exchange. Trial Tr., D.E. 175, 30:1-24, 65:7-68:18, 140:21-24; JT 5, Richard's Aug. 27, 2018 Dep. Tr. 40:8-11; JT 10, Client Trust Records. Richard used his share of the Property proceeds to purchase the Bedminster property in February 2009. Trial Tr., D.E. 175, 30:14-20, 65:12-13, 138:18-24, 140:21-24, 161:10-11. Richard did not consult William regarding that acquisition. *Id.* at 65:1-68:18; JT 4, William's May 4, 2017 Dep. Tr., 24:18-25:6. William did not view the Bedminster property prior to Richard's purchase of it. Trial Tr., D.E. 175, 66:6-8; JT 4, William's May 4, 2017 Dep. Tr., 24:18-25:6. In fact, William

14

played no role whatsoever in that transaction.  Trial Tr., D.E. 175, 65:1-68:18; JT 4, William's May 4, 2017 Dep. Tr., 24:18-25:6.

Wilrick acquired the second property, in Providence, Rhode Island, in September 2009. Like the acquisition of the Bedminster property, William was not involved and did not have access to any aspect of that property.  Trial Tr., D.E. 175, 67:21-68:18; JT 4, William's May 4, 2017 Dep. Tr., 24:18-25:6.

On or about September 3, 2009, Richard and William agreed that Richard would serve as Wilrick's sole manager and member for the Bedminster and Providence properties held by Wilrick.  The Court hereinafter refers to this arrangement as the "2009 Agreement".  P 5, 2009 Agreement.  Both parties signed the 2009 Agreement.  Trial Tr., D.E. 175, 37:4-9; P 5, 2009 Agreement.  The 2009 Agreement does not reference the Property because it had been sold in September 2008.  Trial Tr., D.E. 175, 144:7-11; P 5, 2009 Agreement.  Mr. Fahey testified that the 2009 Agreement was prepared and executed because the title insurance company required documentation that William had no interest in the Rhode Island property.  Trial Tr., D.E. 175, 142:12-24.

Following September 9, 2008, Richard held sole ownership of Wilrick.  *Id.* at 38:9-20, 44:9-13, 44:18-25, 64:22-65:3, 67:18-20, 70:10-25, 145:7-146:10, 149:2-9, 158:23-159:3; JT 3, Richard's May 4, 2017 Dep. Tr., 48:22-49:19; JT 5, Richard's Aug. 27, 2018 Dep. Tr. 12:5-13:23; JT 6, William's Aug. 27, 2018 Dep. Tr. 12:7; D3, Amended Response to RFA #3. William's ownership interest in Wilrick was extinguished upon the closing of the building sale. Trial Tr., D.E. 175, 18:23-25, 36:5-8, 38:9-11, 64:22-65:3.  Therefore, from approximately September 9, 2008 and thereafter, William was, for all intents and purposes, disassociated from Wilrick.  Richard filed tax returns annually as the sole owner of Wilrick.  *Id.* at 66:17-24; 76:4-

12. In each of those filings, Richard reported 100% of Wilrick's income as his own. *Id.* After the Property was sold, William never included Wilrick on his tax returns. JT 6, William's Aug. 27, 2018 Dep. Tr., 19:12-15. Richard and William shared the same accountant for tax purposes. Trial Tr., D.E. 175, 66:25-67:3. Following his disassociation from Wilrick, William had no access to any of Wilrick's financial records. *Id.* at 67:4-6. Wilrick has made no payments to William since the sale of the Property. *Id.* at 77:17-25. Nor did William receive any rent rolls or other revenue from Wilrick. *Id.* at 67:7-8; JT 6, William's Aug. 27, 2018 Dep. Tr., 19:6-8. William had no access to any Wilrick bank accounts following the disassociation, and wrote no checks for liabilities for Wilrick. Trial Tr., D.E. 175, 67:9-15; JT 6, William's Aug. 27, 2018 Dep. Tr., 19:9-11. Similarly, William's name did not appear on any Wilrick checks, and it does not appear that he took a role in managing any of the properties held by Wilrick. *Id.* at 67:18-20.

### F.  Trade or Business

Wilrick does nothing but own property. JT 5, Richard's Aug. 27, 2018 Dep. Tr., 21:10-12. It is a passive investment. *Id.* at 21:13-15. Richard has had no day-to-day responsibilities for Wilrick since before the withdrawal date. Trial Tr., D.E. 175, 73:1-77:25. *See also* Richard's May 4, 2017 Dep. Tr., 45:9-11 (testifying that Richard does nothing for Wilrick on a daily or weekly basis); *id.* at 73:1-11, 75:18-22 (testifying that Richard does not "have to do anything" for Wilrick other than "file for and pay the income taxes" at year's end.). Wilrick has never had any employees or employed any staff. *Id.* at 75:6-17. All of Wilrick's leases are structured as triple net leases, placing full financial, operational, and maintenance responsibility on the tenants. *Id.* at 73:4-11. Wilrick incurs no regular or recurring overhead expenses. *Id.* at 76:13-14. Wilrick's office is Richard's house. JT 3, Wilrick does not engage in marketing to

16

secure new tenants.  Trial Tr., D.E. 175, 76:15-16.  Wilrick exists solely to generate returns on

real estate investments through rental income.  *Id.* at 73:1-77:25.

### IV.    CONCLUSIONS OF LAW

The issues before the Court are whether Wilrick was: (1) a trade or business; (2) under

common control with the Harvard Entities as of the withdrawal date, December 1, 2009.  The

Court addresses each in turn.

### A.  Trade or Business

To hold a non-employer jointly and severally liable for withdrawal liability under 29

U.S.C. § 1301(b)(1), the entity must constitute a "trade or business" under common control at the

time of withdrawal.  *Gov't Dev. Bank for P.R. v. Holt Marine Terminal, Inc.*, 765 F. Supp. 2d

710, 715 (E.D. Pa. 2011).  To determine whether an entity qualifies as a trade or business under

ERISA, courts have relied on the definition of "trade or business" established by the Internal

Revenue Service and articulated by the United States Supreme Court in *Comm'r v. Groetzinger*,

480 U.S. 23, 35 (1987).  *Groetzinger* established that a trade or business must be engaged in an

activity conducted with "continuity and regularity" and for the primary purpose of income or

profit.  480 U.S. at 35.  The "activity" contemplated in *Groetzinger* refers to business activity,

not merely any activity.  *UFCW Loc. One Pension Fund v. Enivel Props. LLC*, 791 F.3d 369,

375 (2d Cir. 2015).  Courts have also considered "whether characterizing an entity as a trade or

business will fulfill the underlying purpose of the MPPAA: to prevent employers from avoiding

withdrawal liability by fractionalizing their operations."  *N.J. Bldg. Laborers' Statewide Benefit

Funds and Trs. Thereof v. Demza Masonry LLC*, No. 18-9607, 2019 WL 6493944, at *7 (D.N.J.

Dec. 3, 2019) (quoting *Gov't Dev. Bank*, 765 F. Supp. 2d at 715).

17

One purpose of the *Groetzinger* test is to distinguish active trades or businesses from passive investments, which cannot support withdrawal liability. *Cent. States Se. & Sw. Areas Pension Fund v. Messina Prods., LLC*, 706 F.3d 874, 878 (7th Cir. 2013). An "investment" is the placement of capital with the expectation of generating income or profit. *Enivel*, 791 F.3d at 374. Passive investments do not constitute trades or businesses. *Gov't Dev. Bank*, 765 F. Supp. 2d at 718; *see also Cent. States, Se. & Sw. Areas Pension Fund v. White*, 258 F.3d 636, 641-45 (7th Cir. 2001); *Enivel*, 791 F.3d at 375.

Similarly, "a mere investment made to make a profit, without more, does not itself make an investor a trade or business." *Sun Cap. Partners III, LP v. New England Teamsters & Trucking Indus. Pension Fund*, 724 F.3d 129, 141-42 (1st Cir. 2013). A passive investment therefore cannot serve as the basis for imputing withdrawal liability under § 1301(b)(1). *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 599-602 (7th Cir. 2015). In distinguishing passive investments from activities rising to the level of a trade or business, courts focus on the activities undertaken with respect to a particular property or holding, rather than mere ownership of the property itself. *Gov't Dev. Bank*, 765 F. Supp. 2d at 718. As courts have observed, "the mere possession of property, 'be it stocks, commodities, leases, or something else, without more is the hallmark of an investment.'" *Id.* (quoting *Cent. States Pension Fund v. Fulkerson*, 238 F.3d 881, 895 (7th Cir. 2001)). For example, the First Circuit has adopted an "investment plus" standard: to impose MPAA withdrawal liability on an entity, that entity must satisfy two conditions, it must: (a) hold an investment in property; and (b) exercise substantial active management over those property holdings. *Sun Cap. Partners III,* 724 F.3d at 141-42. Consistent with this principle, courts have generally found that merely owning and leasing real estate to third parties without more constitutes a passive investment rather than a trade or

18

business. *See, e.g., Gov't Dev. Bank*, 765 F. Supp. 2d at 718; *Enivel*, 791 F.3d at 375; *Fulkerson*, 238 F.3d at 895-96; *White*, 258 F.3d at 643-44; *Auto. Indus. Pension Tr. Fund v. Tractor Equip. Sales, Inc.*, 73 F. Supp. 3d 1173, 1188-89 (N.D. Cal. 2014), *aff'd*, 672 F. App'x 685 (9th Cir. 2016).

Finally, security interests do not constitute ownership interests. *See Liberty Mut. Fire Ins. Co. v. Alexander*, 374 N.J. Super. 340, 349 (App. Div. 2005) (explaining that a mortgagee's interest expands to ownership only upon acquisition through foreclosure); *see also Carrington Mortg. Servs., LLC v. Moore*, 464 N.J. Super. 59, 74-75 (App. Div. 2020) (noting that a mortgage holder possesses only a security interest and lacks control over the property until foreclosure and transfer of title are complete).

In this case, it is Plaintiffs' burden to show that Wilrick was a trade or business. The Court finds that Plaintiffs have not met that burden. There is insufficient evidence that Wilrick was engaged in an activity conducted with "continuity and regularity" and for the primary purpose of income or profit, such that it could have been considered a trade or business. *Groetzinger*, 480 U.S. at 35.

First, Plaintiff has not established that Wilrick's primary purpose was to turn a profit. Richard testified at trial, and both William and Richard testified during their depositions, they formed Wilrick as a holding company because the condition of the Property was deteriorating, and the brothers wished to insulate themselves from personal liability. In short, the purpose of forming Wilrick was more of a shield than a profit-making venture. But even when the Property was sold and Richard attained 100% ownership of Wilrick, Wilrick constituted an investment. Richard's proceeds of the Property were put into a Section 1031 exchange, which was used to buy the Bedminster and Rhode Island Properties. Richard testified that he did no marketing for

19

tenants at either the Bedminster or Rhode Island Properties.  Trial Tr., D.E. 175, 76:15-16.  And since purchasing these two Properties, Wilrick has purchased no additional properties.  *Id.* at 76:17-21.  Therefore, it is reasonable to conclude that Richard used Wilrick to purchase additional properties via the Section 1031 exchange so as to avoid paying any income tax on the sale of the Property.  *Id.* at 30:8-24.  On this record, the Court must find that the primary purpose of Wilrick was not to realize a profit.  Instead, Richard and William had defensive reasons to create Wilrick:  To insulate themselves from personal liability for the aging property, and for Richard to avoid paying income tax when the Property was sold.  *See Enivel*, 791 F.3d at 374 (affirming the district court's finding that the organization "made real estate investments not to earn a living but for personal reasons or to further private wealth management objectives" including long-term personal investments of property).

Plaintiffs also have not established that Wilrick has engaged in business activity with continuity and regularity.  Wilrick's time, which is to say Richard's time, devoted to managing and leasing the Properties was negligible at best.  *See Cent. States, Se. & Sw. Areas Pension Fund v. SCOFBP, LLC*, 668 F.3d 873, 878-79 (7th Cir. 2011) ("Owning property can be considered a personal investment, at least where the owner spends a negligible amount of time managing the leases, . . . although a more substantial investment of time may be considered regular and continuous enough to rise to the level of a 'trade or business.'"); *see also Gov't Dev. Bank*, 765 F. Supp. 2d at 718 (noting that it was "not convinced that the provision of three loans in 1998 [was] sufficiently continuous and regular to constitute a trade or business").  Since September 2009, Wilrick has held two properties: the Rhode Island Property, which is occupied by a Rite Aid pharmacy, and the Bedminster Property, which is occupied by a daycare facility.  Wilrick obtained the Bedminster Property from Rainbow Rascals Hills, LLC on February 27,

20

2009, through a Section 1031 exchange.  Wilrick acquired the Rhode Island Property from Sovereign RA II, LLC on September 3, 2009.  The Rhode Island Property was also purchased through a Section 1031 exchange.  Since that time, Wilrick has maintained written leases with the tenants at both locations.  The Rhode Island Property lease is structured as a triple net arrangement, under which the tenant pays base rent to Wilrick while also bearing responsibility for property taxes, insurance procurement and payment, and all maintenance and repairs.  The Bedminster Property lease is also a triple net lease, with the tenant responsible for rent, taxes, utilities, insurance, and all maintenance and repair obligations.

The Court's inquiry must be anchored to the circumstances existing as of the withdrawal date—*i.e.,* December 1, 2009.  From well before the withdrawal date through the present, Wilrick's activities have been limited to holding and leasing real property to third parties under net lease agreements.  Richard testified at trial that Wilrick never had employees and it did not have a bookkeeper.  At the time of withdrawal, Wilrick functioned exclusively as a passive investment holding company, holding two long-term triple net leases with tenants entirely unrelated to Harvard Press.  There was no "investment plus" element, as the triple net structure of both leases delegated virtually all property management responsibilities to the tenants.  Richard's involvement was minimal as his primary activity consisted of confirming receipt of monthly rent payments by logging into his computer.  It is difficult to conceive of a more limited form of business ownership.  If active business operation and passive investment represent opposite ends of a spectrum, Wilrick occupies the passive end.

Plaintiffs rely on *United Food and Commercial Workers Union v. Progressive Supermarkets*, 644 F. Supp. 633, 638 (D.N.J. 1986) to contend that Wilrick was a trade or business.  In *Progressive Supermarkets*, a company leased its premises on U.S. Route 46 in

21

Rockaway, New Jersey to a supermarket it treated as a related party until approximately three months before that supermarket withdrew from its ERISA pension plan.  The court determined that the leasing company qualified as a trade or business, notwithstanding its changed tenancy as of the withdrawal date.  The court reasoned that any other conclusion would shield assets from ERISA liability, and frustrate the statute's evident purpose of preventing the fragmentation of business enterprises.  But the landowner in *Progressive Supermarkets* continued to own the property as of and after the withdrawal date, and had already entered a new lease with a replacement tenant, ShopRite.  Essentially, the landowner simply substituted a non-union grocery tenant, ShopRite, for the prior union grocery tenant, with the new tenant even purchasing the departing supermarket's assets and inventory.  From the landowner's perspective, the practical reality of the business conducted on the property remained unchanged because the only meaningful difference was the identity and union status of the lessee grocery tenant.  That continuity-of-business use is precisely what gave rise to fractionalization concerns.

The facts here are readily distinguishable.  First, it is undisputed that a September 3, 2009 resolution vested Richard with 100% ownership of all Wilrick properties at that time.  P 5, September 3, 2009 Agreement.  Thus, the ownership structure differs materially from *Progressive Supermarkets*.  Second, unlike *Progressive Supermarkets*, it is undisputed that when the Wilrick principals sold the Property in September 2008, Richard and William each took his profits from the sale and used them very differently.  Richard's proceeds of the sale were rolled into a Section 1031 exchange for the purchase of another property without paying taxes, while William took his money.  In short, there was no continuity-of-business use.  Third, *Progressive Supermarkets* involved a landlord who continued leasing the property after the withdrawal.  Wilrick, by contrast, did not even hold title to the relevant land for approximately fifteen months

prior to the withdrawal date.  Although *Progressive Supermarkets* did involve a brief gap between the termination of the union supermarket lease and the withdrawal date, that gap is effectively neutralized by the fact that the owner retained the property throughout and beyond the withdrawal.  Here, as of the withdrawal date, Wilrick held only a security interest in the Property - an interest that was never exercised because the purchaser of the Property never defaulted on the purchase money mortgage.  A security interest in property does not constitute an ownership interest.  *See Liberty Mut. Fire Ins. Co.*, 374 N.J. Super. at 349 (recognizing that a mortgagee's interest ripens into ownership only upon purchase at foreclosure); *see also Carrington Mortg. Servs.*, 464 N.J. Super. at 74-75 (App. Div. 2020) ("[A] mortgage holder has only a security interest in a property with no control over the land itself until a foreclosure and deed transfer is completed.").

The undisputed record reflects that Wilrick ultimately sold the property to unrelated third parties in furtherance of a public interest in redeveloping a distressed neighborhood straddling the Orange and West Orange border.  That series of events was precipitated, at least in part, by Harvard Press's failure.  Thus, the present case bears little resemblance to *Progressive Supermarkets*, where the same parcel of land on a high-traffic commercial corridor was simply redeployed from one grocery operation to another under a different banner.  The transition in *Progressive Supermarkets* amounted to little more than a name change where ShopRite occupied the same land, purchased the prior tenant's inventory and assets, and continued operating the same type of retail grocery business.  At bottom, there was an unbroken continuity of commercial use.  But no such continuity exists here.  The property was sold to a third party for an urban renewal initiative aimed at revitalizing a challenged, crime-affected neighborhood.  No printing company succeeded Harvard Press on the site.  The purchaser acquired neither Harvard

23

Press's assets nor its inventory. The factual difference between *Progressive Supermarkets* and the instant case is substantial.

With respect to the Property, after Wilrick sold it in September 2008, it held a mortgage on the Property. Thus, Wilrick held a security interest in the Property until the new owners satisfied the mortgage in 2011. The leases on the Bedminster and Rhode Island Properties are triple net leases. The tenants pay rent to Wilrick, are responsible for all maintenance and repairs to the properties, maintain and pay insurance on the properties, and pay taxes and utilities. Thus, Wilrick owns the properties and leases the property via triple net leases. The monthly rent checks are deposited online so Richard need only confirm monthly payments by logging onto the computer. With respect to Wilrick, Richard did nothing more than check his bank account each month to make sure the leases were being paid. The Court can hardly fathom an instance where a company does less in terms of day-to-day operations. Wilrick's real-estate holdings are passive investments. For those reasons, the Court finds that Wilrick was not a trade or business and is not liable for withdrawal liability.

**B. Common Control**

The Court's determination that Wilrick was not a trade or business for purposes of ERISA itself is dispositive. However, in the interest of completeness, the Court considers whether Wilrick was under common control with the Harvard Entities as of the withdrawal date. For the reasons below, the Court finds Plaintiffs have not established that Wilrick and the Harvard Entities were under common control.

Plaintiffs contend that Wilrick was a member of Harvard Press's controlled group, and that Harvard Press and Wilrick are a "brother-sister" group. Accordingly, Plaintiffs argue Wilrick is jointly and severally liable for the amounts due in this litigation, including those for

24

which the Court has already determined the Harvard Entities' liability.  However, Plaintiffs have failed to meet their burden of establishing that Wilrick was a member of Harvard Press's controlled group.

Under Section 4001(b)(1) of ERISA, 29 U.S.C. § 1301(b)(1), all employees of commonly controlled trades or businesses, whether incorporated or not, are treated as working for a single employer, and those trades and businesses are likewise treated as one.  Entities meeting this "common control" standard face joint and several liability for withdrawal liability. *IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 127 (3d Cir. 1986).

To determine whether entities qualify as being under "common control," ERISA incorporates the Internal Revenue Code's definition of "controlled group."  29 U.S.C. § 1301(b)(1).  Treasury regulations define "members of a controlled group" as two or more corporations linked through stock ownership.  26 C.F.R. § 1.414(b)-1 (2024).  The related regulations at 26 C.F.R. § 1.414(c)-1 *et seq.* further define the "common control" standard by examining two key concepts, "controlling interest" and "effective control," which apply differently depending on whether the relationship at issue involves a parent-subsidiary structure, a brother-sister arrangement, or a combined group.  26 C.F.R. § 1.414(c)-2(c).  A brother-sister relationship exists among two or more corporations when: (a) the same five or fewer persons own (b) a "controlling interest" in each entity, (c) those individuals exercise "effective control" over each entity, and (d) each individual's ownership is counted only to the extent it is identical across all of the entities.[10]  26 C.F.R. § 1.414(c)-2(c).  Limited liability companies are treated the same as corporations under this framework.  26 C.F.R. § 1.414(c)-2(a).

---

[10]  Neither side argues that either the combined group or parent-subsidiary structure applies here.

25

"Controlling interest" requires ownership of stock representing at least 80% of the total combined voting power across all voting share classes, or at least 80% of the total value of all share classes.  26 C.F.R. § 1.414(c)-2(b)(2)(i)(A).  On the other hand, "effective control" requires ownership of stock representing more than 50% of the combined voting power or more than 50% of the total value of all share classes.  26 C.F.R. § 1.414(c)-2(c)(2)(i).  No operational nexus between the two companies is required to impose withdrawal liability on an entity that did not sign the collective bargaining agreement.  *See O'Connor v. DeBolt Transfer, Inc.*, 737 F. Supp. 1430, 1444 (W.D. Pa. 1990) (holding that the presence or absence of inter-company transactions is irrelevant to controlled group withdrawal liability).  Membership in the same controlled group is sufficient.  *Id.*  Finally, withdrawal liability attaches only to those trades and businesses that were under common control with the withdrawing employer as of the date of withdrawal.  *Teamsters Pension v. Brigadier Leasing Assocs.*, 880 F. Supp. 388, 396 (E.D. Pa. 1995); *Bd. of Trs. of Trucking Emps. of N.J. Welfare Fund, Inc.-Pension Fund v. Centra*, 983 F.2d 495, 502 (3d Cir. 1992).

It is undisputed that as of the withdrawal date, William and Richard each held a 50% ownership interest in Harvard Press.  Op., D.E. 80, at 2.  The dispute is whether William remained a member of Wilrick as of the withdrawal date such that William and Richard can be considered to own a "controlling interest" in each entity and exercise "effective control" over each entity.  The Court concludes that William was not a member of Wilrick on the withdrawal date.  Thus, Wilrick cannot be considered part of Harvard Press's control group.

At trial, both Richard and Mr. Fahey credibly testified that once Richard and William sold the Property in September 2008, William was no longer an owner of Wilrick.  William took his money from the sale of the Property and dissociated from Wilrick, while Richard reinvested

his proceeds from the sale of the Property via Section 1031 exchanges. Taking ownership of Wilrick, William used the Section 1031 exchanges to buy the Bedminster and Rhode Island Properties. Richard and Mr. Fahey testified that the brothers orally agreed to go their separate ways upon the sale of the Property and that the brothers, along with Mr. Fahey, had multiple discussions to this effect.[11] Richard's and Mr. Fahey's testimony at trial that the brothers decided to go their separate ways upon the sale of the Property is consistent with both Richard's and Williams's deposition testimony. *See* JT 3, Richard's May 4, 2017 Dep. Tr., 49:7-16; JT 4, William's May 4, 2017 Dep. Tr., 8:23-9:9; JT 5, Richard's Aug. 18, 2018 Dep. Tr., 20:3-5; JT 6, William's Aug. 18, 2018 Dep. Tr., 18:17-19:5.

Richard and William later reduced this oral agreement to writing. That Richard was unable to locate and produce this document is of little consequence. The 2003 Member Agreement allowed modifications by William and Richard, and did not contain a clause requiring such modifications to be reduced to writing. [12] JT 8, 2003 Member Agreement; *see also Lewis v. Travelers Ins. Co.*, 51 N.J. 244, 253 (1968) (finding that unless there is a clause in a contract limiting modifications to only those in writing, the parties to that contract have not "disable[d] themselves from amending, supplementing or replacing the contract by a later

---

[11] Moreover, Plaintiffs have not challenged the brothers' oral agreement via a claim under the MPPAA, 29 U.S.C. § 1392(c). Pursuant to § 1392(c), "[i]f a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction." Thus, any challenge to the brothers' agreement that William would disassociate from Wilrick upon the sale of the Property could and should have been brought via claim under § 1392(c).

[12] Plaintiffs' response to Wilrick's proposed findings of fact and conclusions of law takes a different tack. It does not contest Richard's and William's ability to orally modify the Member Agreement. Instead, Plaintiffs now contend that the oral modification never happened. Response, D.E. 185, at 4. However, for the reasons above, the Court disagrees.

27

agreement made orally or by conduct objectively manifesting a new understanding"); *Wells Reit II-80 Park Plaza, LLC v. Director, Div. of Taxation,* 414 N.J. Super. 453, 466 (App. Div. 2010) ("A modification can be proved by 'an explicit agreement to modify or by the actions and conduct of the parties as long as the intention to modify is mutual and clear.'").

Prior to 2013, the 1993 Limited Liability Company Act, N.J.S.A. 42:2B-1, governed New Jersey limited liability companies and did not require any written documentation to establish a member's ownership interest in a limited liability company. *See* N.J.S.A. 42:2B-44(c) (noting that an operating agreement may, but need not, provide for a certificate evidencing a member's interest). The 1993 Limited Liability Company Act also permitted a member to resign from a limited liability company. N.J.S.A. 42:2B-38. Upon resignation, the departing member was entitled to receive the fair value of his or her limited liability interest as of the resignation date, less applicable valuation discounts, within a reasonable time unless the operating agreement specified a different distribution formula. N.J.S.A. 42:2B-39. Disassociation from the limited liability company took effect immediately upon the member's resignation even if a buyout payment was made subsequently. N.J.S.A. 42:2B-24. Once disassociated, subject to N.J.S.A. 42:2B-39, a former member retained only the rights of an assignee of a membership interest. N.J.S.A. 42:2B-24.1. Under N.J.S.A. 42:2B-44(a), an assignee has no right to participate in the management or affairs of the limited liability company unless the operating agreement provides otherwise and either: (1) all non-assigning members approve; or (2) the assignee complies with any procedure set forth in the operating agreement.

Plaintiffs contend that a disassociated member retains the full distribution rights of an active member under N.J.S.A. 42:2B-44(b)(1). The Court respectfully disagrees. The statute expressly makes distributions to assignees "subject to" the buyout provision of N.J.S.A. 42:2B-

28

39, which governs the rights of members who have resigned and become disassociated. Plaintiffs' position that a resigned and disassociated member continues to participate in the limited liability company, as though the resignation never occurred, is without support in the statutory framework.

There is additional support for the Court's conclusion that as of the sale of the Property on September 9, 2008, William was no longer associated with Wilrick. No checks were written from Wilrick to William after the sale of the Property, except those stemming from the mortgage on the Property. JT 10, Client Trust Records. Richard testified that after the sale of the Property, he filed taxes each year on behalf of Wilrick. Only Richard did so, not his brother, and Richard and William shared an accountant. They further testified that on the withdrawal date Richard was the 100% owner of Wilrick. Yet, on the date of withdrawal, William and Richard each held a 50% interest in Harvard Press. Richard's testimony that he was sole owner upon the sale of the Property in September 2008 is further supported by William's testimony, during the first deposition, that he did not know anything about the two other properties Wilrick owned. Wilrick purchased the Bedminster and Rhode Island Properties in 2009. Moreover, the Resolution the brothers signed on September 3, 2009 indicates that Richard was the sole manager and member of Wilrick as to the Bedminster and Rhode Island Properties. P 5, September 3, 2009 Agreement. Those were the only two properties owned by Wilrick at that time.

There are two pieces of evidence that, at first glance, might support Plaintiffs' argument that William was still a Member of Wilrick on the withdrawal date. First, in William's first deposition on May 4, 2017, he testified that he thought he transferred ownership of Wilrick to Richard around 2010. When asked when he transferred ownership in Wilrick to Richard exclusively, William stated: "I'm thinking right after 2010." However, it is clear to the Court

29

that William was likely confused when suggesting a date, as the transfer happened much earlier, and William was equally clear that the transfer of ownership in Wilrick happened contemporaneously with the sale of the Property. William also stated that he stopped receiving money from Wilrick because he had no longer had an interest in Wilrick and that he transferred ownership in Wilrick to his brother when they sold the building. He testified that the sale of the building was the reason for transferring ownership. He also testified that he did not know anything about the two other buildings that Wilrick owned. The logical conclusion from William's deposition is that he misremembered the year he transferred his ownership in Wilrick to Richard, but he was clear it was when the Property was sold—*i.e.,* September 2008.

During William's second deposition, he again confirmed that as of the sale of the Property, he was no longer associated with Wilrick. This time, he remembered the Property was sold and he was out of Wilrick in September 2008. Whether William remembered the date of the sale of the Property is not significant because William consistently testified during both of his depositions was that he was out of Wilrick contemporaneously with the sale of the Property.

The second piece of evidence concerns Defendants' response to Plaintiffs' Request for Admission ("RFA") #3. In answering RFA #3, Defendants initially confused the date the Property was sold and the ownership in Wilrick changed. Richard testified at trial that RFA #3 was confusing, so he answered incorrectly but subsequently amended his response. On August 26, 2018, Plaintiffs served Defendants with Plaintiffs' First Set of Requests for Admissions. Plaintiffs' RFA #3 stated: "Effective prior to December 1, 2009 and continuing past that date, Richard . . . and William . . . each held 50% ownership and voting stock in Wilrick." D3, Amended Response to RFA #3. Wilrick responded: "Denied as Wilrick . . . is an "LLC" and there is no "voting stock". It is admitted that the Wilrick . . . was owned 50/50 by Richard . . .

30

and William . . . on December 1, 2009 and for a time thereafter.  It is denied that the ownership continues to this date." *Id.*  On August 27, 2018, the day after Plaintiffs first served the RFA, during his deposition, Richard testified that his 50% ownership interest in Wilrick became a 100% ownership interest when Wilrick sold the Property on September 9, 2008.  *Id.*  On December 21, 2018, counsel for Defendants sent the amended response to Plaintiffs.  *Id.*  The amended responses stated: "Objection.  This request for admission item is vague as to the time period covered because the item sets forth no beginning or ending time.  It merely seeks an admission as to times before, on, and after December 1, 2009.  Notwithstanding said objection, Defendants deny this item as stated, as . . . Richard . . . owned 100% of Wilrick . . . as of September 9, 2008." *Id.*

The Court is not persuaded that this evidence moves the needle in Plaintiffs' direction. Richard's response to the RFA occurred nearly a decade after the Property was sold.  The parties have consistently testified that Wilrick's ownership structure changed when the Property was sold.  Moreover, Richard's testimony at his deposition on August 27, 2018 occurred nearly contemporaneously with Plaintiffs serving the RFA.  Thus, Richard's statement at trial that the RFA was confusing simply makes the most sense.  Accordingly, the Court is not persuaded that either of these pieces of evidence demonstrates that William continued to be a member of Wilrick as of the withdrawal date.

Plaintiff's mortgage-ownership argument fares no better.  The governing regulation, 26 C.F.R. § 1.414(c)-4(b)(2), concerns attribution of ownership of "an interest in an organization," a category that plainly does not encompass a debt security interest such as a purchase money mortgage.  Wilrick held a lien, not an ownership stake, and the two are qualitatively distinct. Plaintiffs' argument finds no foothold in 26 C.F.R. § 1.414(c)-4.

Section 1563(e)(2) of Title 26 also does not apply.  Section 1563(e)(2) specifically deals with partnerships while Wilrick was a limited liability corporation.  But even assuming § 1563(e)(2) did apply, its partnership attribution rule reaches only corporate stock ownership and not debt security interests.  26 U.S.C. § 1563(e)(1) & (2).  The broader principle concerning mortgages is equally fatal to Plaintiffs' position.  Secured debt does not equal ownership of the encumbered property.  *United States v. Tana*, 618 F. Supp. 1393, 1396 (S.D.N.Y. 1985).  A security interest confers nothing more than a claim against property, but it is not stock in a corporation or an interest in an organization.  *Id.*  Therefore, a security interest in the Property cannot constitute an ownership interest in Wilrick.  Thus, this argument collapses on its own terms.

Because William was no longer a member of Wilrick upon the sale of the Property in September 2008, Wilrick cannot be considered "under common control" with Harvard Press as of December 1, 2009.  Plaintiffs have not identified five or fewer persons who simultaneously held a controlling interest in both entities and exercised effective control over each as of that date, "taking into account the ownership of each such person only to the extent such ownership is identical with respect to each such organization."  26 C.F.R. 1.414(c)-2(c)(1).  As established, William held no ownership interest in Wilrick after September 9, 2008.  From that date forward, Richard was the sole 100% owner of Wilrick.  As of the withdrawal date, William and Richard each held a 50% interest in Harvard Press.

With respect to the controlling-interest prong, Plaintiffs have failed to identify "five or fewer persons . . . with . . . a controlling interest[] in each organization."  26 C.F.R. 1.414(c)-2(c)(1)(i).  As of the withdrawal date, Richard and William each held a 50% ownership interest in Harvard Press.  As to Wilrick, Richard had a 100% ownership interest in Wilrick while

William had none as of the withdrawal date.  Plaintiffs have failed to demonstrate that the controlling interest prong of the subjective test is satisfied because only one person, Richard, owned 100% of Wilrick on the withdrawal date.  Thus, there are not five or fewer people who had a controlling interest in each organization.  *See Loc. 478 Trucking & Allied Indus. Pension Fund v. Jayne*, 778 F. Supp. 1289, 1303 (D.N.J. 1991) ("Under the first of the two-part test for common control, the same five or fewer individuals must own a controlling interest in each of the organizations to be held liable.").

The Court must evaluate the second prong of the common-control test—*i.e.*, "effective control"—by considering each owner's interest only to the degree that it is identical across both organizations.  26 C.F.R. § 1.414(c)-2(c)(1)(ii); *see also Cent. States, Se. & Sw. Areas Pension Fund v. Creative Dev. Co.*, 232 F.3d 406, 420-21 (5th Cir. 2000) (noting that "[o]ne need only consider the relevant example set forth in the regulation to realize that the 'effective control' prong of the common control test is no simple arithmetic exercise" because "there is a tricky factor lurking just beneath the surface of the facially murky phrase, 'only to the extent such ownership is identical with respect to each such organization.'").  "[T]aking into account the ownership of each such person only to the extent such ownership is identical with respect to each such organization," under 26 C.F.R. § 1.4114(c)-2(c)(1), William's ownership interest in Harvard Press is treated as zero because William's ownership percentage of Wilrick as of the withdrawal date was zero.  With the same framework in mind, as of the withdrawal date, Richard's ownership interest in Wilrick is treated as 50% because Richard held a 50% ownership interest in Harvard Press as of the withdrawal date.  Thus, Plaintiffs have failed to establish that under the "effective control" prong Wilrick and Harvard Press were "under common control" because two or more of the same people did not own more than 50% of Wilrick, and did not own

33

more than 50% of Harvard Press as of the withdrawal date.  At bottom, Plaintiffs have failed to satisfy their burden to establish that Wilrick and Harvard Press were under common control such that Wilrick was a member of Harvard Press's controlled group.  Thus, Wilrick is not liable for Harvard Press's withdrawal liability.

## V.    CONCLUSION

For the reasons set forth above, the Court enters judgment in favor of Wilrick.  An appropriate Order accompanies this Opinion.


*s/ Michael A. Hammer*
**United States Magistrate Judge**

**Dated**:  April 10, 2026

**APPENDIX**

<u>**EXHIBITS ADMITTED INTO EVIDENCE**</u>

| Ex. | Description of Exhibit |
|---|---|
| JT 3 | Richard's May 4, 2017 Deposition Transcript - via stipulation |
| JT 4 | William's May 4, 2017 Deposition Transcript - via Court's 4/21/23 Ruling, D.E. 148-149 |
| JT 5 | Richard's August 27th, 2018 Deposition Transcript - via stipulation |
| JT 6 | William's August 27, 2018 Deposition Transcript - via Court's 4/21/23 Ruling, D.E. 148-149 |
| JT 8 | 2003 Member Agreement - via stipulation |
| JT 9 | Resolution - via stipulation |
| JT 10 | Client Trust Records - via stipulation |
| JT 11 | February 25, 2011 Accord and Satisfaction - via stipulation |
| JT 12 | Discharge of Mortgage - via stipulation |
| P 2 | Property Closing Statement - via stipulation |
| P 4 | Mortgage - via stipulation |
| P 5 | September 3, 2009 Agreement - via stipulation |
| P 7 | Response to the RFA #3 - via stipulation |
| P 11 | Exhibit A, Mr. Fahey's March 29, 2010 letter to Mr. Wenner (attached to Mr. Wenner's declaration, which is not in evidence) - admitted at trial |
| D 3 | Amended Response to RFA #3 - via stipulation |